Good afternoon. We're here on the case State Bank of Waterloo v. K.C. Development Group, LLC, Ed Allen, No. 5-170375. This case was originally argued back on July 18, 2018. The court asked for a supplemental briefing and now argument on those issues. So are you ready to proceed? Yes. Thank you. May it please the Court, Mr. Goodkin. Excuse me. Sorry, I'm coughing quite a bit. My name is Jay Hutch. I'm here representing State Bank of Waterloo again. And I want to thank you for the opportunity to address this court once more. I'm pretty much limited to the two issues that you've asked for. I didn't think you wanted to hear from point one to point twenty. So the two issues that the court asked us to address were, one, was it a negotiable instrument when we're talking about the note and or the extension? And two, if it were a negotiable instrument, what effect would it have to the liability of Mr. Hesse based upon the parole evidence that was permitted into the trial? And also the fact that he signed more than one time on the note. So basically, a note to be a negotiable instrument has certain requirements under the code. And there's really one requirement that's at odds in this case. And for that purpose, it really is a case of first impression in the state of Illinois. And that is when we have multiple advanced features on the note. I've gone through the Illinois records, reported cases. I've only found one case that dealt with a multiple advanced feature on the note. That case was Cole v. Davis. I cited it in our brief. In fact, I argued it in our brief. But I will tell you that everything was pretty much dicta on this particular issue. That note was, the case was determined in August, late August of 2016. And the case was about a confession of judgment clause and whether or not that destroyed negotiability on the note. What's interesting, however, is the note was a multiple advanced note. It was laid out, the terms of the note were laid out in the case. And no one argued, they assumed that the multiple advanced feature did not destroy negotiability. In fact, the court found that that note was a negotiable note. But again, as I said, it was on the issue of confession of judgment. Everyone assumed that there, I guess, there was no issue that there were multiple advances. Counsel, the question then is, with multiple advances, does that make it a fixed promise? I mean, that's. Well, the court in that case found it was a fixed promise. And based upon future draws, the real question is, did it require anything additional to be done by the promisor, I believe. And in that case, obviously, they didn't find anything additional was required. If you think of it from the common sense perspective, when you look at other cases questioning negotiability, there's been not a whole lot, but a look to try to expand it and make it pretty liberal. And the issues are mostly on variable rate notes. And of course, Illinois now specifically permits them, but initially did not. And the question is, was there something about this note with the variable rate that would make it difficult for a third party to the transaction to determine? And the whole point is the ability to sell or buy these dead instruments. The court in Cole versus Davis said there was nothing in that note, the variable rate, or excuse me, the confession of judgment that would prevent anybody from knowing what was due. And that's how these other cases have been. They've looked at it, and they've said when it talks about an index, there's nothing that a third party to the transaction would have difficulty in as a result of this other document having to be looked at in order to determine what was due under the note. If you look at multiple advance notes versus single advance notes, if you don't allow multiple advance notes to be deemed negotiable, you're creating a real problem in the industry. For example, construction loans. It's always multiple advances. You rarely see a single advance in a construction loan. So what would the bank or the lender be required to do? If it's not going to be a negotiable instrument, they would have to have a single note for each and every draw. That would add additional time, additional expense, both to the borrower, who is going to bear the expense ultimately, and to the lender. And the lender is going to want to have a negotiable instrument because if they want to be able to sell it, a buyer wants to be a holder in due course. You can't get that status unless you have a negotiable instrument. So from that perspective, the lender is definitely in commerce, which the UCC is supposed to help promote, is going to be very concerned that we have a negotiable instrument. They're not going to want a series of single draw notes. Now, if you also look at it from a third party's perspective, what is going to be required of the seller of the note by the buyer that's any different with a single draw note and a multiple draw note? And the answer is really nothing. The buyer is going to want proof what were the dates and the amounts of every draw, whether it's a single draw note or a multiple draw note. What are the dates and the amounts of every payment? And what other expenses have been added so that they can determine the value of the note? There's no difference between the two, so it makes no real sense that just because you have a multiple draw feature, one should have a different result in the commercial world than the other. The Cole v. Davis case, by the way, had the same type of provision that the note in issue here had, and that was it referenced a grid. Now, in the Cole v. Davis note, it referenced a grid on an attached sheet. In the subject note, the grid is actually on the reverse side of the note. And that note, that grid shows every payment, every draw, and the dates. So you can look at the document itself and know what the balance is on that note, or at least be able to calculate the balance on that note. So, again... You say in that case or this case? Actually, in both. Cole v. Davis, it was an attachment to the note. In the subject case, if you look on the back of the promissory note, which is attached as an exhibit, and in fact... It's attached to my supplemental reply brief. If you look at the bottom of the second page of the note, it has a grid, which shows the date and the amount of payments and draws. So you're not having to go look at another document in order to be able to calculate what the value is of that particular note. Excuse me. Looking at a couple other cases, the case that I think Mr. Gucinec cited, Johnson v. Johnson, we had a variable interest rate. Clem v. Grecian-Shalaites are also in my brief. It's an LOI case, which was cited by the Oklahoma Supreme Court for exactly the same issues. It was, again, a variable interest rate, but it found that that would not disadvantage a stranger to the transaction. And that's what they're looking at. And that's the same thing that's here with this multiple advanced note. So flipping the page and seeing the dates and the amounts of the draws and the repayments does not disadvantage a third party to the transaction. So for that reason, there's no good reason that you would treat this multiple advanced note differently than you would a single advanced note. Even with a single advanced note, you don't know the amount of the draw. It may not be the full amount of the note. People sometimes go to the bank prior to an auction, sign a note so they can buy a car or buy a house, and get a note for more than they end up spending. Go to the bank thereafter and draw less than the full amount of the note. So even with a single advanced note, you don't know immediately what the amount of the principal is from the initial draw, the only draw. Just because the face of the note is $50,000 doesn't mean they, in fact, drew $50,000. Now, if we get beyond negotiability, and I understand that's the hurdle, then under 3402, it's pretty clear. There are basically a couple of different provisions, 402A and B. A1, or A and B1, talk about the type of signature, which was the first signature on the subject note in this case, where an individual signs in a representative capacity, and the named party, the actual party, is named in the document. So when Mr. Hesse signed as president of Hesse Development, Inc., that signature was obviously for Hesse Development, Inc. But it's the second signature, and that's where Hesse signed individually, that 3042, 3402B. The second part of B2 would cover, and that is, if they're not showing the representative capacity, and they're not showing the party who is being represented, and when he signed Charles Hesse, personally, that's obviously true, then you have two potential results. If you're a holder in due course, he's perfectly liable. There's nothing else permitted. He cannot put on parole evidence if you're dealing with a typical holder in due course. The bank is not a holder in due course in this instance. So if you're not dealing with a holder in due course, but you've signed it individually without showing a representative capacity and without showing the party that is being represented, then he has a possible defense with his burden to show that it was not meant to be a personal signature, but that it was meant to be a representative signature by agreement of the party. That's very important. That was not how the trial court treated this case at all. The trial court said in its decision that the bank did not meet its burden of proving that Mr. Hesse did not intend to be personally liable. Under 3402, it's Hesse's burden of persuasion, not the bank's, and it's Hesse's burden to prove that it was not the intent of the parties that there would be personal liability. So there's twofold problem with that. One is it shifted the burden to the wrong party. It shifted it from the bank, or from Hesse, the court shifted it to the bank. And secondly, all the evidence was that, excuse me, I'll go back. Secondly, that the issue then is what was the intent of the parties, not of Hesse. And if you go through the trial evidence, there are basically three witnesses that made any difference in this case. There's the former bank president who made the loan, had the documents drafted. That's Mark Altadonna. There is Charles Hesse, the defendant, who's the athlete. And there's Kenneth Osterhage, who was also a co-maker on the note. Two of those people had nothing to gain by their testimony. Mr. Altadonna was no longer at the bank. He had retired, was not a shareholder. He had nothing in it for him. Mr. Osterhage had already signed a settlement agreement with the bank. Pretty much he lost over a million dollars and had nothing to gain. He was not required to testify for the bank. He came in and testified. Both of them said it was the intent that Hesse and Osterhage would be personally liable for the debt of Casey Development Group, LLC. The only person who said, no, my intent was I wasn't personally liable was Mr. Hesse. The court found that the bank didn't meet its burden of proving Hesse intended to be personally liable. That wasn't the standard. So there was a myriad of evidence that Mr. Altadonna provided, which was the bank policy required the principal behind the business to guarantee the loan, to stand up for the loan. Their bank policy required it. The loan committee approval was subject to the condition that Hesse and Osterhage guarantee the loan. He created the note and made them co-makers for the purpose of making sure it was understood they were personally liable for the loan. He asked for their personal financial information and tax returns before granting the loan and after while monitoring the loan. If they weren't personally liable, there's no point in that. You don't need the shareholders of a business, their personal returns if they're not personally guaranteeing the loan. And then also, what is the point of having their signatures on the note if they weren't signing for Casey Development because Casey Development had two members. They were both corporations. They signed one time for their respective corporation. Hesse had one. Osterhage had one. But then there were separate signatures. What was the point of having separate signatures if they were not meant to be personally liable? So that was the testimony of Mr. Altadonna. Mr. Osterhage testified that he understood when he signed that they were personally backed the loan and that's why they were signed in the note. And he also understood that's why he was required to provide personal financial information like his tax returns. Mr. Hesse just said I never intended to guarantee it. And also testified he never bothered reading the note. But that was the testimony of Hesse that he never intended. And he asked the lender several times if he had to pledge anything additional, provide any additional collateral on the loan. And he was told no. The loan stood up by itself. But that's not the same thing as asking, and he admitted he never asked, am I personally liable for the loan? That's like having a personal home buyer sign a mortgage, sign the note, and think that all they have to do is give up the note, give up the property. But they're not personally behind it. And we all know that's not how it works. And he should have known as well. So I think if you look at it, under the UCC, the court gave the burden of proof to the wrong party. It should have been the Hesse. And there was no proof that the parties intended that there would be no personal liability. Only Mr. Hesse said he intended. And there's the Millside drilling case, which Judge Welch was on the panel many years ago. He said you can't look at the self-serving statements of an individual as proof that they're not responsible for the debt that they didn't sign personally. And that's what we have. We have a self-serving statement by Mr. Hesse that I didn't intend. And if you also look, the question that Mr. Goodconnect asked Mr. Hesse was, what do you want the court to find? And he said I want them to find that I didn't intend to guarantee I'd be personally liable on this debt. He didn't ask, I want them to find that we agreed, that the parties agreed there would not be personal liability. So if you look at this and you look at the alternative, which is if it's not under the ECC, that note obviously was meant to be to accommodation makers and Casey Development as the borrower. That's typical for small businesses. We have a borrower and we have three makers. One is the borrower, two are accommodation makers, Hesse and Osterhockey individually. When you read the note, I think it's pretty obvious and not ambiguous. Thank you. Okay. Thank you, counsel. May it please the court, counsel. For the record, my name is Tim Goodconnect and I represent the appellee in this case and the sole remaining defendant in the case of Charles Hesse. Now, before I get to the two questions that you've asked us to talk about, I feel compelled to once again make an argument regarding waiver. I know I made that argument in July, but I think it's more important even today. And the reason I feel compelled to do that is there's two levels of waiver here. Okay. I mean, not only are the Supreme Court cases that we've cited, Agin and Robinson say you've got to raise it in the trial court first before you raise it in the appellate court. So that's one level we have. But even the second level is the Supreme Court rule that says you can't raise it in your reply brief if you didn't mention it in your main brief. So we don't have one waiver here. We've got two waivers here. Now, as the court indicated in its order asking for the supplemental briefing, that rule doesn't bind this court. I understand that. But if you look at the kind of cases where courts say, okay, we know there should be a waiver here, but we're going to go past that, it's generally cases where they say it's an issue of law and it's been fully briefed. Well, now we have fully briefed it. But it's not exactly an issue of law because your determination on the issue that should be waived, that may be the issue of law, but it's going to require, as a result, an application of facts, and that's not what an issue of law is. The judge applied the law as he knew it to these facts. And so this isn't something that can easily be decided by this court if you decide that the issue isn't waived. Counsel, are you saying then, you know, if the court decides it's not waived, we should send it back to the trial court for factual determinations? I'm not sure that if you find that it's not waived and you find it's a negotiable incident and you find that the judge's decision either isn't in line with that provision of the UCC or cannot be determined, I think you do have to send it back. At a minimum, to have the judge look at the evidence again and say, you know, based on some new standard, but maybe again as a whole new trial. I mean, counsel was just complaining I didn't ask my witness the right question at trial. I asked him the question based upon the pleadings and the briefs of the party at the trial court. So I'm not sure how we avoid having a whole new trial, frankly. And that's really why I'm raising labor again here. There's evidence in the record that prior to trial, attorney's fees for the bank were already $127,000. Then there's a day and a half of trial. Then there's briefing there. Then there's an appeal where we have briefing and argument here. Now we have a supplemental issue with supplemental briefs, additional argument. You send it back for another trial. Now my client is looking at paying more in attorney's fees than he might have been liable for under the note. And I think if you don't hold the bank to the waiver of this issue, you're going to make my client pay for sloppy work on the part of the plaintiff. As Justice Carminer said in the Jackson case that we cited, as a general rule, our system is designed around the premise that the parties know what's best for them and that they are responsible for advancing those facts and those arguments at trial. After $127,000 in attorney's fees prior to trial, I think the bank should have known what its best arguments were and what facts and arguments to make at trial. And they didn't do that. And I don't think that this Court should reward them for sloppy work  Now I understand the Court has concern about setting a bad precedent. What I would offer to the Court there is Rule 23. If the Court is truly concerned about a bad precedent, if you do not recognize the waiver here, make it a non-precedential case. I think that that's the easy way to handle this. Moving to the issues that the Court has asked about. What's this a negotiable instrument? We don't believe that it is. As counsel indicated in his argument, this is really a question of first impression. As he admitted that the Cole case involved the confession of judgment, it was actually certified to the Court on that issue. So the issue of whether or not that note was a negotiable instrument based upon a multiple advance feature was not argued, was not briefed. So I don't think Cole's precedent here. I think this is first impression. And then we've cited the Johnson case to show how this happened with the variable interest rates when they first came along and courts were wary. The legislature stepped in, amended the code at UCC to make it clear, yes, we want that to be recognized as a negotiable instrument. That should be the same path for this. If, in fact, a multiple advance note should be considered a negotiable instrument, the banking industry has ways of getting the laws changed that they need to have for certainty and reliability. Have the UCC be changed to recognize that. We don't have that here. Counsel offers the analogy to a construction loan. But I would submit in construction instances, there's one advance, it goes into a construction escrow so that each draw is on that escrow. It's not additional multiple advances on the same notes. I don't think that analogy works at all. And counsel also talks about, well, everything you need to determine the sum of money on the note is handwritten on there for the multiple advances. I point out to the court, the extension agreement has no such spot for that. So there may have been a spot where people hand wrote things on the first note. The extension does not have that on it. So we can't rely on that. And strictly on that, I don't think this is a negotiable instrument until the legislature says that it's a negotiable instrument. If, in fact, the court finds this to be a negotiable instrument, however, I don't think that the verdict here still should be reversed. And there are two reasons on that. One, the case law that we relied upon at the trial court level and in the first briefing is still valid notwithstanding whatever the UCC says. And secondly, the evidence. So back to the case law. The UCC Provision 1-103B basically says that case law is not affected by the provisions of the UCC to the extent that it's not directly affected. Those cases still serve to supplement what's in the UCC. And I submit that the main cases we relied upon aren't really affected by the adoption of Section 3-402 back in 1992. One of the cases we hung our head on is the Chandler case that says when the note's ambiguous, you have a right to present circumstantial evidence on that and determine it based on the circumstantial evidence. That's a case from 1996. That's after the statute changed. The Uptown Federal case goes before the statute change. That's the one that says, once again, extrinsic evidence to show capacity intent. But I don't think that case was decided on a burden issue. It was decided because they say everything else in this note does not speak to joint seller liability. An ambiguous signature clause doesn't change that. In fact, in that instance, they wrote over the word. I'm sorry, that's the next case. The Kankakee Concrete Products case wrote over the word individually. Again, that's before 3-402, but it cited 3-402's predecessor statute, as I lay out in our brief. But, again, they didn't decide it on that. They decided it on the rest of the document. The rest of the document said nothing about joint liability. The rest of this document says nothing. I'd like to remind the Court, the borrower on this note is not Charlie Hessey. It's a company, a company whose members were two other companies. So there's nothing else in this note that would indicate that he has any liability whatsoever, and that's the same as the Kankakee Concrete Products case. In the doubt and doubt case, the one that the trial court here relied upon in its final paragraph, if you read, they said, citing doubt and doubt, ambiguities are construed most strongly against the drafter. That's 1998. So that's after this UCC provision came into play. And that's the main case here. Ambiguity construed most strongly against the drafter. Whether or not you find this to be a negotiable instrument doesn't change the fact that you have, the trial court was required to construe that ambiguity against the bank. It doesn't change that. There have only been a couple of cases on this UCC provision 3-402 since it was adopted, and none are on point here. Now, the second reason I don't think the result should change, even if you find it to be a negotiable instrument, is that the evidence strongly indicated that Mr. Hessey's sole intent was not to be liable, and nobody else had an intent otherwise. The trial court did a good job laying out the evidence that it heard and why it was coming to the conclusion it came to. And that was based upon, first, the documents. The note didn't list Mr. Hessey as a borrower. The mortgage didn't list Mr. Hessey as a borrower. None of the other documents listed him as a borrower. Mr. Hessey's own actions were consistent with no agreement for him to be liable. He didn't list this loan on financial disclosures. He certainly, at the end, when he stopped putting personal money in, when he was trying to save his investment, he stopped putting personal money in and said, I'm pulling the plug on this. If there was an agreement for him to be personally liable, he wouldn't do that. Counsel, why would he be obligated to get financial information? His testimony at trial was going – he had not been involved in real estate deals, but he was a businessman, and he said that – he named one of his prior attorneys and said, anytime you're going to the bank for a loan, this is what they're going to ask for, this is what you bring. What's critical here to remember, though, is that very first financial disclosure form he filled out after the loan was made was actually in Mr. Altadonna's handwriting. That's in the bank's president's handwriting. And he doesn't list this loan as a personal liability. So he just thought it was a matter-of-course sort of thing. Also, I mean, his individual returns would also show the information coming from the company that was actually the member here. So Mr. Altadonna's actions, the court found them to be quite confused. Mr. Altadonna couldn't explain the differences between different – and even counsel was arguing about guarantees here. There's no guarantee document here. And, again, Mr. Altadonna was being – his action of not putting that on the financial disclosure form when he's helping Mr. Hesse fill it out, that's inconsistent with any agreement. And Mr. Altadonna's testimony, the trial court specifically found it not to be credible. And he even got it wrong from what the bank's standpoint is. He thought that he was only on the hook for half the loan. So that's not even what the bank's position is here. So in light of all that evidence, and the trial court did a good job of laying it out, I don't think the result changes even if you shift a burden in this case. I think the trial court correctly found no personal liability on the part of my client. It's as laid out in the order, as relied upon by doubt and doubt, construing the ambiguity. This court really can only reverse the trial court if you find that that ruling was unreasonable, arbitrary, or not based on the evidence. I don't think, even if we have a negotiable instrument here, I don't think the end result is that the trial court ruled unreasonably, arbitrary, or not based on the evidence. Counsel talked about a policy the bank had for requiring the members of an entity to be co-maker. Actually, he said guarantee. And the trial court specifically found the bank didn't have such a policy when it was two entities underneath the borrowing entity. So that doesn't come into play here. Counsel said that the bank had a requirement of individual guarantors. Well, first off, there were no individuals who were members of the LLC. But secondly, there's no guarantee document here. So when he says that the loan approval was based upon guarantees, there were no guarantees executed. There were none prepared. The case was a mess from the standpoint of the bank trying to fork in liability on my client. I'd like to remind the court something that I said when we were here in July. My client's the only one who never got a dime out of this project. The other defendants did work and got paid for that work. The bank got the proceeds from the sale of all the property and got a million dollars in cash and property from the other defendants when they set up with them, which wasn't applied to the benefit of my client, and the trial court found that. If the trial court did, in fact, apply the loan burden, it's not the trial court's fault. It's the fault of the bank for not pointing out that this may be covered by the UCC. So it's not the trial court's fault. So even though it's the bank who screwed up by not pitching their case that way at trial, the bank now wants to reverse so they can pin my client on the unpaid portion of the loan, the fees from the trial, the fees from the first part of this appeal, the fees from the second part of the appeal, and the fees that may still be generated to come. And I submit to you such a result would not be just. In fact, far from it. Justice doesn't require you letting the bank correct its ambiguous paperwork that led to this dispute to begin with. Justice doesn't require letting the bank's counsel cure their hundred-plus-thousand-dollar mistake by not raising this at trial. A just result here would be to affirm the trial court's ruling as reasonable, not arbitrary, and based on the evidence. Does the court have any other questions? All right. Thank you, counsel. Thank you. Rebella? Thank you. First, I'd like to go, and I forgot to do this on direct. In our supplemental reply brief on page 10, the fourth line from the bottom, we referenced appellant, and it should have been appellee. I caught it when I was preparing for today, so it was an error in our submittal. When I listen to Mr. Goodconnect, there are several problems here. First of all, the trial court got it wrong. We were required to plead facts. We did. The court applies the law, and they're going to apply the correct law. Shifting the burden of proof is absolutely critical, and it's wrong. And I know there's a FOIA case that was heard in this district. In fact, Judge Welch sat on that panel too. She sits on a lot of panels. And it found that it was required to be remanded back to the trial court when they shift the burden improperly. I think that's it, except the trial court got the very beginning wrong, which was finding that there was an ambiguity in the note. This case should have been decided on the four corners of the note, no parole evidence. And if you look at it, it's not ambiguous. It has a bar listed, which is the LLC.  It's got signatures for two individuals personally. They weren't listed as borrowers. The court could not fathom that they signed personally, but they were not borrowers. They weren't borrowers. They weren't listed as borrowers because they were accommodation parties. They were lending their credit to the entity so it could get a loan. It's very typical in small business loans. And it also says that in the note right above signature, they're accepting the terms on this reverse side of the note, the second page. And the second page defines I. Because it starts off with, I promise to pay you or pay $705,000. The definition of I is on the second page. Borrowers and anyone else who agrees to pay the note. There's an independent application provision on the second page. And it says anyone who agrees to pay the note by signing, for example, signing the note. So I includes accommodation makers who sign the note personally. There is nothing ambiguous. It's done all of the time. And without an ambiguity, without the UCC issue under 3402, on whether he was personally responsible the way he signed or not, under the common law, he would never have gotten into parole evidence. And the court should not have gone that way. Mr. Gutknecht said that construction loans would go, that all the money would go into an escrow account up front and he would draw from that. Well, that's not quite how it typically occurs. Escrow loans are set up so that you draw as you need them. Because if you took all of the money and put it into an escrow account up front, your borrower would be screaming murder at you because you'd be charging an interest on all of the money up front. He doesn't want to pay for it until he draws it. So typically you have a single note. It calls for multiple draws as they need the money. And as they draw, interest starts accruing on the principal that's been drawn. Mr. Gutknecht brought up the handwriting of the first financial statement, the testimony of Mr. Alsadana, and he did fill it out. But he said he put down what Mr. Hesse told him to put on it. He didn't change his answers. He merely put his answers on the paperwork. The court also, I think the trial court, found the bank policy incorrect. It provided that if you were a small business, it looked at the principles behind it. Well, the principles are the individual owners behind it who are making decisions. He is correct. It didn't have a separate rule for entities owned by other entities. But it looked for the principles behind it. And finally, I guess I want to look at Mr. Hesse is now complaining about the legal fees. And, you know, he complained about the alleged ambiguity. Thank you, sir. Thank you, counsel. Counsel, for again coming back for your briefs and your arguments today, the court will take this matter under advisement and render a decision to the courts.